*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-BG-75

IN RE MOHAMED ALAMGIR, RESPONDENT.

A Disbarred Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 447715)

On Report and Recommendation of a Hearing Committee of
the Board on Professional Responsibility
(DDN 272-19; BDN 19-BD-71)

(Argued May 26, 2022                           Decided September 8, 2022)

*Abraham C. Blitzer* for respondent.

*Myles V. Lynk*, Senior Assistant Disciplinary Counsel, with whom *Julia L. Porter*, Deputy Disciplinary Counsel, and *William R. Ross*, Assistant Disciplinary Counsel, were on the brief, for Disciplinary Counsel.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and MCLEESE, *Associate Judges*.

PER CURIAM: Mr. Alamgir was disbarred in 2004 and now seeks to be reinstated. The Hearing Committee recommends reinstatement. We deny reinstatement.

## I. Background

A disbarred attorney seeking reinstatement must prove fitness to resume the practice of law by clear and convincing evidence. *In re Yum*, 187 A.3d 1289, 1291-92 (D.C. 2018) (per curiam); D.C. Bar R. XI, § 16(d)(1)(a-b) (disbarred attorney must prove by clear and convincing evidence that attorney possesses requisite "moral qualifications, competency, and learning in law" and that reinstatement "will not be detrimental to the integrity and standing of the Bar," detrimental to "the administration of justice," or "subversive to the public interest"). The following factors are considered in determining whether a disbarred attorney has made the required showing:

> (1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law.

*In re Roundtree*, 503 A.2d 1215, 1217 (D.C. 1985).

"The first *Roundtree* factor is of primary importance in considering the petition for reinstatement." *In re Yum*, 187 A.3d at 1292 (internal quotation marks omitted). When the disbarred attorney's misconduct is "closely bound up with [the

disbarred attorney's] role and responsibilities as an attorney," we apply "heightened scrutiny to the other *Roundtree* factors." *Id.* (internal quotation marks omitted). "Although we place great weight on the recommendations of the . . . Hearing Committee, this court has the ultimate authority to decide whether to grant a petition for reinstatement." *Id.* at 1291 (internal quotation marks omitted).

The Hearing Committee held an evidentiary hearing and made extensive findings of fact. In sum, the evidence and findings were as follows.

## A. Underlying Misconduct

The nature and circumstances of Mr. Alamgir's underlying misconduct appear to be undisputed. Mr. Alamgir was convicted of 164 felony counts, for the offenses of conspiracy, immigration fraud, and money laundering. In a course of criminal conduct that began in 1996 and lasted for at least seven years, Mr. Alamgir charged immigrant clients a premium to submit fraudulent immigration documents in order to illegally obtain employment visas on their behalf. The criminal conduct netted Mr. Alamgir at least $2.75 million, and Mr. Alamgir bought at least five properties with proceeds of the criminal conduct.

To help carry out his criminal conduct, Mr. Alamgir recruited his paralegal to forge employer signatures; paid employers to claim falsely that clients worked for them; laundered proceeds through bank accounts of his relatives and friends; and coached his clients on what lies to tell immigration officials to obtain their employment visas.

Mr. Alamgir pleaded guilty, and he agreed to forfeit $2 million in the form of a money judgment. Mr. Alamgir also agreed to sell at least two of five properties that he obtained with the proceeds of his criminal conduct and to provide the proceeds of those sales to the United States.

Mr. Alamgir's paralegal pleaded guilty to conspiring to defraud the United States in connection with Mr. Alamgir's criminal conduct. One of Mr. Alamgir's family members, whose bank account Mr. Alamgir used to launder money, lost his job after pleading guilty to participating in the criminal conduct. Many employers also pleaded guilty to their involvement in the criminal conduct, and one employer was deported.

The Hearing Committee concluded that Mr. Alamgir engaged in grave misconduct that was closely bound up with his role and responsibilities as an

attorney. The Hearing Committee therefore stated that it would apply heightened scrutiny to the remaining *Roundtree* factors.

## B. Recognition of Seriousness of Misconduct

Mr. Alamgir testified that he recognized the seriousness of his criminal conduct and took full responsibility for that conduct. Mr. Alamgir also testified that he regretted the pain his criminal conduct caused the legal community and his friends, family, clients, and colleagues. Mr. Alamgir, however, was unable to testify in any detail about what happened to those directly harmed by or involved in his criminal conduct. Mr. Alamgir did testify that he believed that the family member who lost his job later found employment, that one of the employers involved was deported, and that many of the clients involved were not deported. Mr. Alamgir apparently did not refund any fees to his clients or pay any of his clients' resulting attorney's fees.

Regarding the money judgment, Mr. Alamgir sold two properties and used the proceeds and other funds to pay about $700,000 of the $2 million money judgment. Mr. Alamgir testified that the United States waived the rest of what was owed on the money judgment because most of the proceeds of Mr. Alamgir's criminal conduct

were bound up in properties that lost value. To support this testimony, Mr. Alamgir provided a copy of a "Certificate of Release of Lien" issued by the United States, which indicated that the remaining balance of the money judgment had been waived. Mr. Alamgir, however, failed to provide a clear explanation of what happened to the other three properties. At times Mr. Alamgir seemed to deny that he had owned the properties, and he also suggested that he lost one or more of the properties to tax sales or other civil litigation.

The Hearing Committee credited Mr. Alamgir's testimony that he recognized the seriousness of his misconduct and regretted the harm he caused his family, friends, and clients. The Hearing Committee acknowledged Mr. Alamgir's failure to explain in detail what happened to the remaining proceeds of his criminal conduct, but the Hearing Committee nevertheless credited Mr. Alamgir's testimony that the proceeds had been invested in properties that had declined in value.

## C. Subsequent Conduct/Remedying Past Wrongs

After his disbarment, Mr. Alamgir volunteered with several Bangladeshi-American civil and charitable associations, serving in leadership roles. Mr. Alamgir also volunteered with an organization that helps people who have suffered strokes

and other medical conditions. While working with these organizations, Mr. Alamgir was recognized for his fundraising, years of service, and community involvement. Mr. Alamgir also stayed active in the legal community by working as a paralegal on immigration matters, often for little or no pay.

The Hearing Committee acknowledged that Mr. Alamgir could have done a better job of explaining how his public service served to remedy his past wrongs. The Hearing Committee concluded, however, that Mr. Alamgir's criminal conduct had harmed the immigration system and the Bangladeshi community. In the Hearing Committee's view, Mr. Alamgir's charitable work helped to remedy those harms, by focusing on assistance to immigrants and by countering the "shame" that Mr. Alamgir's criminal conduct had brought upon the Bangladeshi community.

### D. Present Character

Mr. Alamgir called several character witnesses: Mr. Karmakar, Mr. Chowdhury, Mr. Gomes, and Mr. Haleem. Those witnesses testified that Mr. Alamgir was a good person, but they had limited information about the nature of Mr. Alamgir's underlying misconduct. Mr. Karmakar knew that Mr. Alamgir had made unethical choices related to his role as an immigration attorney, but he did not know

the details.  Mr. Chowdhury thought that Mr. Alamgir had been convicted for money-laundering, forging immigration documents, and overcharging clients, but he also did not "know the specifics."  Mr. Gomes knew nothing about Mr. Alamgir's underlying misconduct.  Mr. Haleem knew that Mr. Alamgir had "made some mistakes" and had been incarcerated, but Mr. Haleem knew none of the details.

The Hearing Committee recognized that Mr. Alamgir's character witnesses did not have a complete understanding of the criminal conduct for which Mr. Alamgir was disbarred.  In the Hearing Committee's view, however, the character witnesses had sufficient understanding that Mr. Alamgir's misconduct was "serious."  Moreover, the witnesses had a detailed understanding of Mr. Alamgir's subsequent charitable and humanitarian work.  The Hearing Committee concluded that the character traits that led to Mr. Alamgir's disbarment no longer existed.

### E.  Qualifications and Competence

After his disbarment, Mr. Alamgir took over 200 hours of Continuing Legal Education courses.  Mr. Alamgir also worked part time for over two years as a paralegal for firms dealing in immigration law.  One of the attorneys for whom Mr. Alamgir worked, however, had been suspended twice by the Pennsylvania Bar, once

for submitting false documents in immigration cases and once for making a false statement of material fact to an immigration court.

The Hearing Committee acknowledged that the prior disciplinary record of Mr. Alamgir's supervising attorney was relevant to that attorney's credibility. Nevertheless, the Hearing Committee found that Mr. Alamgir was qualified and competent to practice law in the District of Columbia.

## F. Conclusion

A majority of the Hearing Committee concluded that Mr. Alamgir had proven by clear and convincing evidence that he was fit to practice law in the District of Columbia. The Hearing Committee therefore recommended that Mr. Alamgir be reinstated. One member dissented, concluding that Mr. Alamgir's evidence of "generalized good work" was insufficient to show by clear and convincing evidence that Mr. Alamgir had taken steps to remedy his past wrongs.

## II. Analysis

Disciplinary Counsel raises two threshold arguments. First, Disciplinary Counsel argues that Mr. Alamgir is not eligible to seek reinstatement because he failed to comply with the requirements of D.C. Bar R. XI, § 14(g), which requires disbarred attorneys to promptly file an affidavit with this court and the Board on Professional Responsibility attesting, among other things, that the attorney gave notice of the disbarment to clients and adverse parties. *See* D.C. Bar R. XI, § 16(c) ("[A] disbarred attorney shall not be eligible for reinstatement until five years shall have elapsed following the attorney's compliance with section 14."). Second, Disciplinary Counsel argues that Mr. Alamgir's underlying misconduct was so serious that Mr. Alamgir should be deemed categorically ineligible for reinstatement. We do not reach either of those arguments. Rather, we assume for current purposes that Mr. Alamgir is eligible to be reinstated and that Mr. Alamgir's prior misconduct does not categorically preclude reinstatement.

We acknowledge that Mr. Alamgir provided substantial evidence in support of his petition. We also acknowledge the "great weight" this court gives to recommendations of the Hearing Committee concerning petitions for reinstatement.

*In re Yum*, 187 A.3d at 1291 (internal quotation marks omitted).  We nevertheless deny Mr. Alamgir's petition.

Mr. Alamgir's underlying misconduct was extraordinarily grave, extraordinarily extensive, and directly connected to his work as an attorney.  It is undisputed that we therefore must give heightened scrutiny to the remaining *Roundtree* factors.  *In re Yum*, 187 A.3d at 1292.  More specifically, we conclude that Mr. Alamgir's "egregious" misconduct "weighs heavily against reinstatement." *In re Fogel*, 679 A.2d 1052, 1055 (D.C. 1996).  In light of that misconduct, Mr. Alamgir would have needed to present a truly compelling case in order to establish by clear and convincing evidence that he should be reinstated.  We conclude that Mr. Alamgir fell short of such a showing.

First, the evidence was murky on the question whether Mr. Alamgir took reasonable steps to remedy his past wrongs by fully divesting himself of his unlawfully obtained proceeds.  It is clear that Mr. Alamgir did not fully satisfy the original $2 million judgment, instead paying only about $700,000.  Although the United States apparently eventually released Mr. Alamgir from that judgment, there was no direct evidence as to why the United States did so.  Mr. Alamgir testified that the United States waived the remaining $1.3 million owed on the money judgment

because his properties lost value, but he provided no documentation detailing that this was why the United States waived the rest of the money judgment. Mr. Alamgir's testimony also was very unclear about the disposition of the properties he obtained using illegal proceeds.

Second, we are troubled by Mr. Alamgir's apparent failure to take any steps to try to make amends to the people whom he harmed through his criminal conduct, including his paralegal, friends, family, and clients. Mr. Alamgir apparently had little knowledge about or interest in the consequences of his criminal conduct for others.

Third, Mr. Alamgir's character witnesses knew too few details of Mr. Alamgir's misconduct to give their testimony much weight. *See, e.g.*, *In re Cleaver-Bascombe*, 220 A.3d 266, 269-71 (D.C. 2019) (per curiam) (denying reinstatement petition where attorney's character witnesses "were not familiar with the details of [attorney's] original misconduct and/or were not aware of [attorney's] false bankruptcy filings"); *In re Yum*, 187 A.3d at 1292-93 & n.2 (denying reinstatement petition where attorney's character witnesses were "unfamiliar with the details of [attorney's] misconduct," because character witnesses only knew "misconduct related to attorney's fees" and "arose from 'miscommunications' with a client"); *see*

*generally id.* at 1292 ("A petitioner [seeking reinstatement] is expected to put on live witnesses familiar with the underlying misconduct who can provide credible evidence of petitioner's present good character.") (internal quotation marks omitted).

On the last point, Mr. Alamgir cites a case in which this court granted reinstatement even though the disbarred attorney's character witnesses were not familiar with the details of the attorney's prior misconduct. *In re Bettis*, 644 A.2d 1023, 1029-30 (D.C. 1994). In *In re Bettis*, however, "we were not applying the heightened scrutiny that we apply here in light of the egregiousness of [Mr. Alamgir's] misconduct and its close relation to [Mr. Alamgir's] role and responsibilities as an attorney." *In re Fogel*, 679 A.2d at 1056 n.9 (brackets and internal quotation marks omitted).

Fourth, we are also troubled by the fact that the immigration attorney for whom Mr. Alamgir has been working had herself been twice disciplined for dishonest conduct in connection with immigration proceedings. Mr. Alamgir's decision to work for an employer with such a history raises some reasonable doubt about the depth of Mr. Alamgir's professed commitment to put his own dishonest conduct in such proceedings behind him.

In sum, we conclude that Mr. Alamgir failed to demonstrate by clear and convincing evidence that he is fit to be reinstated.  We therefore deny Mr. Alamgir's petition for reinstatement.

*So ordered*.